## State *vs*. Robert Gaines.

### JUNE 12, 1911.

Present: Dubois, C. J., Blodgett, Johnson, Parkhurst, and Sweetland, JJ.

(1) *Criminal Law. Policy Lottery. Complaints.*

Upon a complaint charging defendant with knowingly having in his possession a certain bill, slip, certificate, token and other device and article such as is used in carrying on, promoting and playing the game commonly known as policy lottery and policy, evidence showing that defendant had in his possession a slip of paper which was the record of the drawing of that day in the game of policy, which record was necessary in promoting the game, and that defendant when asked about the drawing of that day had, in response produced the slip, was sufficient to establish the allegations of the complaint.

(2) *Evidence.*

In a criminal complaint charging defendant with knowingly having in his possession a "policy slip," a witness for the State was properly asked if he knew from his experience and knowledge what a certain slip of paper shown to him, was.

(3) *Evidence.*

In a criminal complaint charging defendant with knowingly having in his possession a "policy slip," a witness who had testified that he had played the game for years was asked: "For what purpose are those policy slips shown by the writer to the player? A. Because lots of people play policy and like to see the drawing, even though they don't play today, they like to see the drawing. Q. And to whom are such slips delivered? A. To the writer.":—

*Held*, admissible and relevant.

(4) *Evidence.*

In a criminal complaint charging defendant with knowingly having in his possession a "policy slip," evidence of a conversation between a police officer and defendant was introduced, wherein defendant was asked where he got the policy slip, and gave his explanation of how it came into his possession, and thereafter he was asked to read the slip, and he did so:—

*Held*, that the evidence was admissible since the fact that he read the slip showed that defendant had knowledge of its significance and purpose.

(5) *Evidence. Policy Lottery.*

In a criminal complaint charging defendant with knowingly having in his possession a "policy slip," "Q. What if anything did defendant say to

you about that slip? A. He said it was a policy slip. Q. And you asked him what those numbers on the top meant and he told you it meant September 13th, drawing one? A. Yes," was admissible as showing that defendant knew the slip was a policy slip.

(6) *Policy Lottery. Constitutional Law.*

Chapter 376 of the Public Laws passed at the January session, 1909, in amendment of and addition to Chapter 283 of the Gen. Laws, 1909, of lotteries, policy-lotteries, etc., is not obnoxious to the provisions of Cons. R. I. Article I, sections 6, 10, and 14.

CRIMINAL complaint. Heard on exceptions of defendant, and overruled.

BLODGETT, J. The defendant has been found guilty by the verdict of a jury in the Superior Court of the charge contained in the following complaint, viz.: "That at said Providence, in said county on the 13th day of September, A. D. 1909, with force and arms, Robert Gaines alias John Doe, of said Providence, laborer, Did knowingly have in his possession a certain bill, slip, certificate, token and other device and article such as is used in carrying on, promoting and playing the game commonly known as policy lottery and policy, against the Statute and the peace and dignity of the State."

The case is before this court upon the defendant's exceptions to the denial of a motion for a new trial and also upon his exceptions to the admission and rejection of evidence at the trial. The statute under which the complaint was preferred is Pub. Laws, cap. 376, passed March 16, 1909, and is as follows: "An Act in amendment of and in addition to Chapter 283 of the General Laws, entitled 'Of Offences against Public Policy.'

*It is enacted by the General Assembly as follows:*

"SECTION 1. Section 28 of Chapter 283 of the General Laws of Rhode Island is hereby amended to read as follows:

"SEC. 28. Whoever keeps, sets up, promotes, or is concerned as owner, agent, clerk, or in any other manner, in managing any policy-lottery or policy-shop, or writes, prints, sells, transfers, or delivers any ticket, certificate, slip, bill, token, or

other device purporting or designed to guarantee or assure to any person, or to entitle any person to a chance of drawing or obtaining any prize or thing of value to be drawn in any lottery or in the game or device commonly known as policy-lottery, or policy; or for himself or another person writes, prints, sells, or transfers or delivers, or has in his possession for the purpose of sale, transfer, or delivery, or in any way aids in selling, exchanging, negotiating, transferring, or delivering, a chance or ticket in any lottery, or in the game or device commonly known as policy-lottery or policy, or any such bill, slip, certificate, token, or other device, or who sells or offers to sell what are commonly called lottery-policies, or who indorses a book or other document, for the purpose of enabling others to sell or offer to sell lottery-policies, or who shall receive, register, record, forward, or purport or pretend to forward, or undertake to forward, or receive and agree to forward, to or for a lottery, or to or for any particular lottery, or to any person, within or without this state, any money, thing, or consideration of value, to purchase an interest or share in any lottery, or to obtain or secure for any ' person what is commonly called a lottery-policy, or a chance of drawing or obtaining any prize or thing of value to be drawn in any lottery, or in the game or device commonly called policy-lottery, or policy, or who shall receive or offer to receive any money, thing, or consideration of value to be forwarded to or for a lottery, or to or for any particular lottery, or to any person to invest in a lottery, within or without this state, whether the same actually exists or not, or whether any drawing of the same, or any act to allot any prize or thing of value, takes place or not, or whether there be any such person or not, or whoever shall have in his possession, knowingly, any bill, slip, certificate, token, or other device, or article of any kind such as is used in carrying on, promoting, or playing the game commonly known as policy-lottery or policy, shall, upon conviction, be punished by fine not exceeding five hundred dollars or imprisonment not exceeding one year, and upon a second conviction of a violation of this section shall be imprisoned for a period not less than one nor more than five years."

(1)　The defendant's first exception is as follows: "That the Court erred in denying the defendant's motion for a new trial which was based upon the ground that the verdict was contrary to the evidence and the weight thereof; that the evidence did not establish the guilt of the defendant beyond a reasonable doubt; that the verdict was against the law." As to so much of said exception as relates to the sufficiency of the evidence, the decision of the trial justice in denying the motion for a new trial on that ground is unquestionably correct, and is as follows: "The evidence shows that on the afternoon of the 13th of September, 1909, the defendant had in his possession a certain slip of paper marked at the top, as follows: '9, 13, 1,' and underneath two columns of figures containing 12 figures each; that such slip of paper was the record of the drawing in the game of policy lottery of the morning of that day, and that this record is necessary in promoting the game, as it enables the persons who play to ascertain whether or not they have won or lost. The evidence also shows that at the request of one witness for the State, who said to the defendant, 'Is anything doing? I want to see the morning drawing,' the defendant produced the slip in question.

"These facts were not contradicted. From the evidence in the record it is apparent that the defendant knowingly had in his possession this slip and that said slip is a 'certain bill, slip, certificate, token and other device such as is used in carrying on, *promoting* and playing the game commonly known as policy-lottery and policy.'

"It is the opinion of the Court, therefore, that the allegations of the complaint are established beyond a reasonable doubt by the proofs, and that the verdict of the jury was justified.

"Motion for a new trial denied."

(2)　The defendant's second exception is as follows: "That the Court erred in admitting the 'slip' in evidence over the defendant's objection taken to question 34, found on page 9 of the transcript of the evidence."

The slip in question was as follows:

"9—13—1

| 24 | 78 |
|----|----|
| 69 | 43 |
| 54 | 21 |
| 27 | 44 |
| 66 | 40 |
| 2  | 71 |
| 47 | 5  |
| 12 | 24 |
| 35 | 59 |
| 50 | 32 |
| 70 | 63 |
| 26 | 52" |

The question referred to was to the witness Bowen and was as follows: "Now do you know from your experience and knowledge what that slip is?" The question was whether the witness knew what the slip was, and was entirely proper. The succeeding question and answer gave the basis of his knowledge. "Q. 35. What do you say that slip is? A. It is a policy slip, in my opinion. Q. 36. How do you know that? A. Well, I have received it from a man that has been playing the game, and I asked him for it, and he returned it to me as one, and it is similar to the ones that I have got in the district as being policy slips." The exception is without merit.

The defendant's third exception, to the testimony of the witness Johnson, is as follows: "That the Court erred in admitting question 13 and answer thereto, found on page 37 of said transcript of the evidence." (p. 37). "Q. 13. What is it? Objected to by Mr. Beagan. THE COURT: Answer the question. He has played the game. Mr. Beagan's exception noted. A. It is a policy slip." This exception is also without merit for the same reason.

(3)    The defendant's fourth exception was to the testimony of the witness Johnson, who had already testified that he had played the game for many years. "Q. For what purpose are

those policy slips shown by the writer to the player? A. Well, they are given to him because lots of people play policy and they like to see the drawing, even though they don't play today, they like to see the drawing." The testimony was clearly admissible and relevant and the defendant takes nothing by his said exception.

The defendant's fifth exception is as follows, and was directed to the testimony of the same witness, Johnson: "That the Court erred in admitting the following question and answer: (p. 70) "Q. And to whom are such slips delivered? A. To the writer." To understand the relation of the question objected to it is proper to state also the question which preceded it and certain questions which follow: (p. 69) "Q. 253. I will ask you one more question: If it has been covered, I don't care to press it. What part in the game of policy do these slips play, similar to the State's Exhibit A.? Mr. BEAGAN: That has been covered. THE COURT: It indicated what numbers had come out in the morning drawing, he said. Q. 254. And to whom are such slips delivered? Mr. BEAGAN: They might give them to persons entitled to them and they might not. They might give them deliberately or inadvertently. THE COURT: He is accused of knowingly having this slip. Mr. BEAGAN: This man is not accused of having played the game, and if they saw fit to charge him with that, the statute was broad enough to have included a charge of that kind. THE COURT: He is charged with knowingly having this slip in his possession. You may answer the question. Mr. BEAGAN: I am going to suggest another objection, and that is the fact it is apparent from this man's own testimony that he is not an expert, has no expert knowledge of what was done in September of this present year; that the conditions he was familiar with were conditions which prevailed before the first of January, this year, and he knows nothing by actual experience. THE COURT: I think I can take judicial knowledge of the fact that he had. The very next section but one provides that the Court will take judicial knowledge of the general character. Mr. BEAGAN: If the State sees fit to ask an expert

witness if he can tell it, and he can not, why, the State cannot go beyond that witness' knowledge. THE COURT: Ask the question. Mr. Beagan's exception noted. Q. 255. And to whom are such slips delivered? A. To the writer. Q. 256. What does the writer do with them? A. Distributes them among the customers. Q. 257. Among his customers? A. Yes, sir. Q. 258. And by customers you mean players? A. Yes, sir." This testimony was also clearly admissible and relevant and the fifth exception is overruled.

(4)    The defendant's sixth exception was to the admission of a conversation between the witness Lawrence, a police captain, and the defendant, and was as follows: "That the Court erred in admitting the question 23 and answer thereto, found on page 77 of said transcript of the evidence." (p. 77) "Now, will you tell what the conversation was? Mr. BEAGAN: I object on the ground that you cannot prove an offence by admissions; that the *corpus delicti* must be established independent of any admissions or statements. He cannot give conversations until there is an independent establishment of the offence; he cannot give the admissions to establish guilt. THE COURT: They have produced testimony to prove exactly that, to prove that this man had this in his possession. Mr. Beagan's exception noted. Question read to the witness. A. Mr. Bowen handed me this policy slip and said that he took it from—— THE COURT: Leave that out. I ruled that out yesterday. Q. Tell the conversation you had with Gaines? A. I asked Gaines, 'What! Are you writing policy again?' He says, 'No.' I says, 'Where did you get this policy slip' He says, 'I got it from a man on Weybosset Street.' I says to him, 'Who was the man?' He said he didn't know his name. I asked him was he colored or white, and he said he was white. I says, 'Now, you had this in your possession, and I presume that you were showing this to this man that you stopped on the street when Officer Brown approached you.' He says, 'No, this was given me by a man on Weybosset Street.' I said, 'Did you have anything to do with that policy at all?' You don't write it?' He says, 'No.' I says, 'I advise you not to

have any more of those slips or have anything to do with policy afterwards.' He was arrested in this complaint. I made complaint, and he was arrested on the warrant a few days later, and he had in his possession at that time—— Objected to by Mr. Beagan. THE COURT: We are trying him on this case now. Q. 25. Was there any further conversation at that time Captain? Objected to by Mr. Beagan. Q. 26. Any further conversation between you and Gaines at that time. Mr. BEAGAN: It was apparent that the Captain was going to run into something else. He is an experienced man in court. THE COURT: This is the conversation on the 13th of September, 1909, in the police station. A. I asked Mr. Gaines while there to read this policy slip. I had seen some similar to this. He said, or he called it off, 9th month, 13th day, and the first drawing. We had quite a little conversation on policy, and with that, I let him go." The ultimate answer given by the witness Lawrence shows that the question was clearly admissible and that the defendant had knowledge of the significance and purpose of the slip in question.

(5) The defendant's seventh exception is as follows, to the testimony of Captain Lawrence: (p. 83) "Q. 38. What if anything did the defendant say to you about that slip? A. He said it was a policy slip, Mr. Gaines did. Q. 39. And I understood you to testify that you asked him what those numbers on the top meant, and he told you it meant September 13th, drawing one? A. Yes, sir. Mr. BEAGAN: I move to strike out the statement of the witness in which he designated this as a policy slip. THE COURT: In what part—the answer to next to the last question? I deny the motion. It may stand for what it is worth. Mr. Beagan's exception noted." The evidence was clearly admissible as showing that the defendant knew that the slip in question was a policy slip and the defendant's seventh exception is overruled.

The defendant's eighth exception was as follows: "That the Court erred in refusing to direct the jury to return a verdict of not guilty as requested on page 86 and 87 of said transcript of the evidence." (p. 87) "Mr. BEAGAN: The evidence is very

unsatisfactory as indicating knowledge on the part of this defendant as to what that was. THE COURT: I think there is sufficient evidence to go to this jury that this slip is used in carrying on and promoting the game. The motion to direct a verdict is denied." The trial justice was clearly right, and this exception is overruled.

The ninth exception does not appear to be urged upon the defendant's brief.

(6)    The tenth exception is as follows: "That Chapter 376 of the public laws passed at the January Session of 1909 being an act in amendment of and in addition to Chapter 283 of the General Laws, entitled 'Of Offences against Public Policy,' is unconstitutional and void and repugnant to Sections 6, 10, and 14 of Article 1 of the Constitution of the State of Rhode Island and Providence Plantations, the constitutionality of said act being brought in question in said case and the decision thereof reserved, as found on page 86 of said transcript of the evidence." The sections of the constitution therein referred to are as follows:

"SEC. 6. The right of the people to be secure in their persons, papers, and possessions, against unreasonable searches and seizures, shall not be violated; and no warrant shall issue, but on complaint in writing, upon probable cause, supported by oath or affirmation, and describing, as nearly as may be, the place to be searched, and the persons or things to be seized." . . .

"SEC. 10. In all criminal proceedings, the accused shall enjoy the right to a speedy and public trial, by an impartial jury; to be informed of the nature and cause of the accusation, to be confronted with the witnesses against him, to have compulsory process for obtaining them in his favor, to have the assistance of counsel in his defence, and shall be at liberty to speak for himself; nor shall he be deprived of life, liberty, or property, unless by the judgment of his peers, or the law of the land." . . .

"SEC. 14. Every man being presumed innocent, until he is

pronounced guilty by the law, no act of severity which is not necessary to secure an accused person shall be permitted."

We see no violation of any of the foregoing provisions in the record before us. The guilt of the accused did not rest upon any presumption, but the significance and purpose of the slip were established by direct testimony, as was also the fact that the accused knew of such significance and purpose when he had the slip in his possession; and against the testimony for the State he offered no evidence.

Defendant's exceptions overruled, and case remitted to the Superior Court for sentence.

*William B. Greenough, Attorney-General, Harry P. Cross, Second Assistant Attorney General,* for State.

*John P. Beagan,* for defendant.